UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
DOMINIK J. GABRIELSEN,

                          Plaintiff,

              -against-                                          **REPORT AND
                                                                RECOMMENDATION**

CAROLYN W. COLVIN,                                       12 Civ. 5694 (KMK) (PED)
Acting Commissioner of Social Security,[1]

                          Defendant.
------------------------------------------------------X

TO THE HONORABLE KENNETH M. KARAS, United States District Judge:

## I.  INTRODUCTION

*Pro se* plaintiff Dominik John Gabrielsen brings this action pursuant to 42 U.S.C. §

405(g) challenging the decision of the Commissioner of Social Security (the "Commissioner")

denying his application for benefits on the ground that he is not disabled within the meaning of

the Social Security Act (the "SSA"), 42 U.S.C. §§ 423 *et seq.*  The matter is before me pursuant

to an Order of Reference dated January 14, 2013 (Dkt. #12).  Presently before this Court is the

Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure (Dkt. #18 (motion), #19 (memorandum of law in support)).  For the

reasons set forth below, I respectfully recommend that defendant's motion be **DENIED** and the

case **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative

proceedings.[2]

_____

[1]  Carolyn W. Colvin became Acting Commissioner of Social Security on February 14,
2013.  As a result, she is substituted as defendant pursuant to Rule 25(d) of the Federal Rules of
Civil Procedure.  The Clerk of the Court shall amend the caption to reflect the substitution.

[2]  "Although a remand request is normally made by a party, there is no reason why a
court may not order the remand *sua sponte*."  <u>Clark v. Callahan</u>, No. 96 Civ. 3020(SAS), 1998

## II. BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security Administration, filed by defendant in conjunction with the Answer (Dkt. #11).

A.     Application History

Plaintiff was born on June 8, 1981.  R. 29, 147.  On or about August 17, 2010, plaintiff applied for Supplemental Security Income disability benefits, alleging that he had been disabled since November 1, 2008 due to various psychological impairments.  R. 147-50.  His claim was administratively denied on October 25, 2010.  R. 89-93.  On December 1, 2010, plaintiff requested a hearing before an administrative law judge ("ALJ").  R. 95.  On September 30, 2011, that hearing was held in White Plains, New York before ALJ Robert Gonzalez.  R. 31.  Plaintiff appeared with counsel; plaintiff and his mother, Barbara Gabrielsen, testified at the hearing.  R. 35-86.  On January 19, 2012, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the SSA and, thus, was not entitled to disability benefits.  R. 7-20.  The ALJ's decision became the final order of the Commissioner on May 21, 2012, when the Appeals Council denied plaintiff's request for review.  R. 1-6.  Plaintiff timely filed this action on July 23, 2012.

B.     Treating Sources

The administrative record contains various medical and other treatment records.  The following is a distillation of their relevant points.

1.     *Saint Vincent's Hospital Westchester*

On July 7, 2009, plaintiff was evaluated at Saint Vincent's Hospital Westchester by Dr.

---

WL 512956, at *1 (S.D.N.Y. Aug.17, 1998) (internal quotation marks omitted).

Carol Weinstein. R. 230-36. Plaintiff did not believe he needed to be evaluated, but his parents urged him to seek therapy (and possibly medication). R. 230. Plaintiff stated his mood had been fine; he had not been anxious or depressed. Id. Plaintiff reported that he gets irritable at times and wakes up frequently during the night. Id. Dr. Weinstein observed that plaintiff's speech and thought content were normal, his attitude was cooperative, his mood was euthymic and his thought process was coherent. R. 231, 234-35. Plaintiff's insight and judgment were fair. R. 235. Dr. Weinstein rated plaintiff's global assessment of functioning ("GAF") at 70. Id.[3] She determined that plaintiff did not require inpatient treatment, and provided him with the contact information for several clinics near his home. R. 226.

2.    *MHA Westchester*

Plaintiff began receiving mental health treatment at MHA Westchester on July 23, 2009. R. 252. He was evaluated and counseled there on-and-off during the following two years by psychiatrist Dr. Rhea Johnson and Licensed Clinical Social Worker ("LCSW") Joanne Baecher-DiSalvo. R. 252-308. Their Progress Notes are summarized below.

LCSW Baecher-DiSalvo conducted plaintiff's initial evaluation on July 23, 2009. R. 252. During the evaluation, plaintiff expressed that his parents were concerned about "his ability to function positively [and] successfully in the world" and "noted that his mother sometimes thinks he is delusional." Id. Plaintiff talked about his life "in a rambling, somewhat tangential

---

[3] "GAF is a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning." Petrie v. Astrue, 412 F.App'x 401, 406 n.2 (2d Cir. 2011) (citing *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 376–77 (4th ed., text revision, 2000) ("DSM–IV")). "The GAF scale ranges from 0 to 100; GAF scores from 61–70 indicate some mild symptoms or some difficulty in social, occupational, or school situations, but general functioning and the existence of some meaningful personal relationships." Id. (citing DSM–IV at 34).

[and] fantastic manner." Id.  He was diagnosed with Cyclothymic Disorder.  Id.[4]

On July 30, 2009, LCSW Baecher-DiSalvo met with plaintiff and his mother.  R. 253.
His mother "expressed concern about [plaintiff's] lack of focus and follow-through [and]
reported provision of financial support on [plaintiff's] behalf for many years."  Id.  Plaintiff's
responses to his mother's criticism "seemed to make some sense but were difficult to follow.  He
continued to maintain that he was doing well at current pursuit–solar business[–and] stated that
he would be getting money tomorrow."  Id.

On August 3, 2009, LCSW Baecher-DiSalvo received a telephone call from plaintiff's
mother, who called to "express concerns about [plaintiff and] provide more detailed information
about his behavior and presentation over the past several years."  R. 255.  According to his
mother, plaintiff maintained a B average during his first year at the Rhode Island School of
Design ("RISD") and then his personality changed.  Id.  He struggled with classes and was
placed on academic probation several times.  Id.  The Dean of RISD "expressed concern that
[plaintiff] was [a] pathological liar."  Id.  At one point, plaintiff returned home and attended a
local SUNY college.  Id.  Overall, he attended college from 2000 to 2006 and is one class shy of
a degree.  Id.  After college, plaintiff began a relationship with a girl who was diagnosed as bi-
polar and they moved to California.  Id.  Plaintiff often talked about grand schemes and deals but
nothing materialized; he was unable to make a living and his parents supported him financially.
Id.  Plaintiff returned to New York in the fall of 2007 and got a job with an arborist; he held this

---

[4] "Cyclothymic disorder is a mild form of bipolar disorder (manic depressive illness) in
which a person has mood swings over a period of years that go from mild depression to
emotional highs."  MedlinePlus, a service of the U.S. National Library of Medicine and the
National Institutes of Health, available at
http://www.nlm.nih.gov/medlineplus/ency/article/001550.htm.

job for two months.  Id.  Plaintiff's girlfriend told his mother that plaintiff "would talk to God [and] get messages from him."  Id.  Plaintiff and his girlfriend had violent fights and eventually broke up.  Id.  In February 2008, plaintiff moved in with friends in New Jersey who lived in a graduate school dorm; he moved back home in June 2009.  Id.  Plaintiff's mother believes that he is "not connected to what is going on."  Id.  According to his mother, plaintiff "often appears very arrogant [and] superior [and] has exaggerated sense of self.  His reasoning appears off [and] this affects his judgment."  Id.  "Mood swings were also reported along w/ disconnect between content [and] affect. [Plaintiff] is described as very distractible w/ racing thoughts."  Id.  Plaintiff's mother also reported that plaintiff, at times, "exhibits a good deal of anger [and] aggression [and] can be very intimidating."  Id.

    On August 6, 2009, LCSW Baecher-DiSalvo met with plaintiff and his mother.  R. 256.  Plaintiff reported pain in his feet after having played tennis for two hours the day before in bare feet, because he did not have sneakers.  Id.  Plaintiff also "reported that business was going very well [and] that he had received money [and] had check in his pocket; he has not yet given mother any money [and] shows no sign of having any himself."  Id.  Plaintiff "continued to speak in tangential manner [and] argued [with] mother when she discussed his tendency to over-exaggerate his abilities–[plaintiff] went on about incident when he was able to re-create Michelangelo drawings 50x [and] did outstanding job."  Id.  Plaintiff was agreeable to psychiatric evaluation but expressed concerns about medication.  Id.

    Dr. Rhea Johnson evaluated plaintiff on August 19, 2009.  R. 248.  Dr. Johnson noted that plaintiff "minimizes and rationalizes" his symptoms "in somewhat loose, tangential way.  Does not want meds."  Id.  Dr. Johnson also noted the need for more data (based, in part, on the inconsistencies between plaintiff's report and that of his mother) and planned to continue

plaintiff's assessment in two weeks.  Id.  According to Dr. Johnson's handwritten notes on her
Psychiatric Evaluation Form dated 8/19/09, plaintiff stated he was a "professor of Viennese art,"
an "architect" and had been "elected to City council in LA."  R. 250.

LCSW Baecher-DiSalvo met with plaintiff on September 3, 2009.  R. 258.  During that
session, "[g]eneralities abounded [with] little attention paid to specifics; [plaintiff] was vague
about plans to move to an apartment [and] talked about possibly moving in [with] old roommate
in Rhode Island."  Id.

Dr. Johnson continued her evaluation of plaintiff on September 9, 2009.  R. 249.
Plaintiff denied psychosis, mania, overt anxiety or any other impairment in functioning.  Id.
He attributed his financial troubles to past bad judgment, which he has "learned from.  He
describe[d] an otherwise comfortable life where he is excited about work at times, mostly happy,
and hopeful about future."  Id.  Plaintiff was not interested in medication.  Id.  Dr. Johnson
observed no signs of psychotic disorder "[o]ther than some oddness in relatedness and some
overinclusive and at times circumstantial thinking."  Id.

On October 6, 2009, LCSW Baecher-DiSalvo had another telephone conference with
plaintiff's mother (at her request for an update following the completion of plaintiff's
assessment/evaluation).  R. 259.[5]  Baecher-DiSalvo explained that plaintiff's specific diagnosis
was unclear, but appeared to be bipolar, mood disorder with clear ADHD symptoms as well.  Id.
Baecher-DiSalvo noted that "[a]lthough [plaintiff's] thoughts are often extremely abstract, he
does appear reality based at his core.  Id.  Baecher-DiSalvo also noted plaintiff's "apparent
tendency to over represent his successes [and] underreport his impairments."  Id.  Plaintiff's

_____

[5]  At plaintiff's initial session, he "had given permission for matters to be discussed
[with] his mother."  R. 259.

-6-

mother reported that the previous night was plaintiff's first night in a rental house in Goldens Bridge.  Id.

On October 13, 2009, plaintiff met with LCSW Baecher-DiSalvo.  R. 260.  Plaintiff's "mood [was] subdued as [he] discussed concerns in [a] manner that was often difficult to follow. [He] reported things to be going well at his job [and] at his new living quarters, a cottage he is renting."  Id.  Plaintiff also reported that he had been arrested on October 10th on a warrant for non-appearance on a DWI charge more than a year ago, and remained overnight in county jail until his mother posted a $10,000 bond.  Id.

On December 3, 2009, LCSW Baecher-DiSalvo closed plaintiff's treatment case.  R. 261. Plaintiff's diagnosis was non-specific mood disorder and history of ADHD.  Id.  Baecher-DiSalvo noted that plaintiff "who is 28, was living [with] parents [with] no livelihood other than seemingly far-fetched plans to begin world-wide solar/energy business."  Id.  "At last contact, [plaintiff] had moved out of parents' home; he reported that business was doing quite well. [Plaintiff] stopped attending psychotherapy sessions [and] did not respond to clinician's efforts to contact him, both by phone and letter."  Id.

On June 15, 2010, plaintiff returned to treatment in lieu of being enrolled in a substance abuse treatment program and was evaluated by LCSW Baecher-DiSalvo.  R. 262.  She noted that plaintiff "presents in rambling, often unclear manner" and "continues to work on alternative energy/construction business that seems to still be in formative stages of development.  He lives in cottage on large piece of property [and] since moving in has only paid 1 month's rent; he has worked in kind fixing up the place [and] property to cover his living expenses."  Id.  Baecher-DiSalvo also noted that plaintiff's "thinking often appears grandiose [with] possibility of

-7-

delusions underlying" and diagnosed "Mood Disorder NOS." Id.[6]

On July 19, 2010, LCSW Baecher-DiSalvo received a telephone call from plaintiff's mother. R. 267. She "reported that [plaintiff's] reports that he is doing well [with] energy business are false [and] noted that he has no money, is unable to pay his bills [and] will probably soon be evicted." Id.

After a delay of several months due to treatment authorization issues (R. 265-66), plaintiff met with LCSW Baecher-DiSalvo on January 31, 2011 for his initial session in his new course of treatment. R. 345. Plaintiff reported a recent week-long period of mania and sleeplessness but few other symptoms. Id. Plaintiff's conversation was "difficult to follow as Dominick tends to speak in round-about [and] seemingly unfocused way." Id. Baecher-DiSalvo noted that plaintiff's "business dealings appear to have failed [and] he is now focusing on dealing [with] sale of others' art work." Id.

Dr. Johnson assessed plaintiff on February 10, 2011. R. 340. Dr. Johnson noted plaintiff's long history of "oddness of presentation and thinking as well as seemingly chronic hypomania and moderate depressive [symptoms] which has caused impaired functioning in some domains." Id.

LCSW Baecher-DiSalvo met with plaintiff on February 14, 2011. R. 339. Plaintiff "continue[d] to speak in tangential [and] loosely connected manner." Id. His reported symptoms include inattention, lack of focus, manic behaviors (at times) and difficulty sleeping. Id. Plaintiff "reported that when under stress, he has become paranoid [and] fearful [and]

_____

[6] NOS is an abbreviation for "not otherwise specified." See Mitchell v. Colvin, No. 09–CV–5429, 2013 WL 5676289, at *2 n.4 (E.D.N.Y. Oct. 17, 2013).

sometimes behaves very differently than usual presentation; he noted he can become angry." Id.
He further reported that he had been smoking a lot of marijuana which heightened his paranoia,
but he stopped using marijuana in November 2010. Id. Plaintiff blamed the failure of his
energy business on other people's failure to complete their responsibilities, and (because he was
aware that his parents did not believe this business was real) he offered to show papers to prove
its existence. Id.

Dr. Johnson met with plaintiff on February 24, 2011 for ongoing evaluation and
assessment of his medication needs. R. 333. They discussed "likely" diagnoses, including
bipolar spectrum, cycloythmia and ADHD, and plaintiff agreed to a trial of medication
(Zyprexa) "to target mood lability and impulsivity." Id.

In a report dated March 2, 2011 (R. 330-32), Dr. Johnson noted that plaintiff "reports
worsening anxiety in last few years" and, during the prior six months, he reported "continued
anxiety, insomnia, staying up at times for days, poor appetite with weight loss." R. 330. Dr.
Johnson stated that plaintiff "is observed by family and providers to have limited self care, often
has no food in his home, grooming and hygiene has suffered, he demonstrates anhedonia and
little motivation." Id. Dr. Johnson reported the results of her mental status exam as follows:

> Appearance: tall, thin poorly groomed with facial hair, unwashed/brushed hair,
> loose knit cap. Clothing ripped and held together by may safety pins. Easily
> engaged, no psychomotor abnormalities. Speech: slow, mutters at times, soft
> volume. Mood "not so good, off[.]" Affect: oddly related, aloof, inappropriate to
> content/setting at times. Thought process: vague, circumstantial, at times
> tangential and over-inclusive. Little actual content. Thought content: eccentric,
> grandiose ideas at times, spiritual and mystical references, no SI HI AH VH or
> delusions. Insight and judgment limited. Cognition: not formally tested but
> vocabulary excellent, fund of knowledge excellent. Impulse control: good.

R. 331.  Dr. Johnson assessed plaintiff's GAF to be 40.  R. 332.[7]  In the section captioned

"Diagnostic Impression," Dr. Johnson stated:

> Mr. Gabrielsen has many symptoms which correspond to a chronic mood disorder
> which has had recurrent depressive episodes and a near persistent hypomanic
> state inter-episodically.  He also likely suffers with a lifelong attentional deficit
> which has been undertreated.  Because his symptoms have been moderate and he
> has had supports, he has managed to survive in the community.  However,
> because these symptoms are so pervasive and without clear periods of remittance,
> he has not managed to make any strides to function independently.  He appears to
> have very limited ability to engage in planning, decision making and carrying out
> of tasks that is necessary for meaningful employment or to sustain relationships.
> He seems to get lost in details and fanciful ideas that may have potential at their
> core but due to symptoms he cannot see through to fruition.

R. 332.

On March 28, 2011, LCSW Baecher-DiSalvo met with plaintiff and his girlfriend.  R.

321.  Plaintiff's girlfriend "expressed concern that Dominick will be drug-tested at times [and]

still continues to smoke marijuana."  Id.  Plaintiff discussed his desire to teach art to children

"and then diverged onto confusing discussion of his plans [and] work [with] energy company

[with] little apparent concern/worry re: meeting basic requirements for food, shelter, etc."  Id.

Plaintiff met with Dr. Johnson on April 7, 2011.  R. 320.  Plaintiff reported "some more

clarity of thought, better follow through and organization since starting medication."  Id.  Dr.

Johnson noted positive improvements in affect, relatedness, thought process and content.

On May 2, 2011, LCSW Baecher-DiSalvo met with plaintiff and his new case manager.

R. 314.  Baecher-DiSalvo noted that plaintiff "continues to take Zyprexa medication as

prescribed by clinic psychiatrist [and] reports improved functioning."  Id.

Plaintiff met with Dr. Johnson on May 5, 2011.  R. 313.  She noted the "good effect" of

_____

[7]  A GAF score of 31 to 40 corresponds to a major impairment in several areas, such as
work, family relations, judgment, thinking, or mood.  DSM-IV at 32.

plaintiff's medication, *to wit*, that she and plaintiff "both have noticed he has been more focused and stable, appropriate in affect.  He recently sustained stress without debilitating mood [symptoms]."  Id.  Dr. Johnson also noted improvements in plaintiff's grooming, relatedness and thought process.  Id.

LCSW Baecher-DiSalvo met with plaintiff on May 16, 2011.  R. 310.  Plaintiff "spent most of the time talking somewhat vaguely about energy business [and] art-selling businesses that he is involved in.  He reported that he is eating well [and] taking care of himself."  Id. Baecher-DiSalvo noted that plaintiff's "[f]ocus on clear goals remains vague."  Id.

At his next session with Dr. Johnson on June 2, 2011, plaintiff reported that he had been helping friends deal with unrelated tragedies and losses, and was "coping with it all 'quite well.'"  Id.  Plaintiff denied any mania or depression.  Id.  He also "reported he is helping with the sale of a friend's family's sale of a 14 million dollar work of art."  Id.  Dr. Johnson noted no change in symptoms /impressions from their prior session.  Id.

Dr. Johnson completed a Medical Source Statement on June 7, 2011, wherein she reported her assessment of what plaintiff can still do despite his mental impairments.  R. 296-300.  Dr. Johnson reported that plaintiff exhibited the following and signs and symptoms: appetite disturbance with weight change; mood disturbance; emotional lability; difficulty thinking or concentrating; oddities of thought, perception, speech or behavior; blunt, flat or inappropriate affect; illogical thinking or loosening of associations; decreased energy; hostility and irritability.  R. 296.  In the space designated "other symptoms and remarks," the doctor wrote: "Magical thinking present to some degree, grandiosity, very poor reality testing, easily distracted."  R. 297.  Dr. Johnson described the "clinical findings which demonstrate the severity of [plaintiff's] mental impairment and symptoms" as follows:  "Client is vague and

-11-

overgeneralized then circumstantial and tangential in thoughts.  Has much difficulty with staying on task due to this, cannot reasonably answer direct questions in way that makes consistent sense." Id.  Dr. Johnson also rated plaintiff's capabilities to perform basic mental activities of work on a regular, continuing basis:

> No/Mild Loss:
> -sustain an ordinary routine without special supervision
> -ask simple questions or request assistance
> -accept instructions and respond appropriately to criticism from supervisors
> -respond appropriately to changes in a routine work setting
> -be aware of normal hazards and take appropriate precautions
> -travel in unfamiliar places
> -use public transportation
>
> Moderate Loss:
> -remember locations and work-like procedures
> -understand and remember very short, simple instructions
> -carry out very short, simple instructions
> -understand and remember detailed instructions
> -deal with stress of semi-skilled and skilled work
> -make simple work-related decisions
> -complete a normal workday or workweek w/o interruptions from psychologically-based
>     symptoms
> -perform at a consistent pace w/o an unreasonable number and length of rest periods
> -interact appropriately with the public
> -get along w/ coworkers and peers w/o unduly distracting them or exhibiting behavioral
>     extremes
> -maintain socially appropriate behavior
> -adhere to basic standards of neatness and cleanliness
> -set realistic goals or make plans independently of others
>
> Marked Loss:
> -carry out detailed instructions
> -maintain attention and concentration for extended periods, i.e. 2 hour segments
> -maintain regular attendance and be punctual
> -work in coordination w/ or proximity to others w/o being unduly distracted

R. 297-299.  Finally, Dr. Johnson indicated to what degree the following functional limitations exist as a result of plaintiff's mental impairment:

> -restriction of activities of daily living: SLIGHT

-12-

-difficulties in maintaining social functioning: MODERATE

-deficiencies of concentration/persistence/pace (resulting in failure to timely complete tasks): FREQUENT

-episodes of deterioration/decompensation in work, work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs/symptoms: ONCE OR TWICE

R. 299.

LCSW Baecher-DiSalvo also completed a Medical Source Statement on June 7, 2011.  R. 302-06.  She reported that plaintiff exhibited the following signs and symptoms:  mood disturbance; emotional lability; paranoia or inappropriate suspiciousness (at times); oddities of thought, perception, speech or behavior ("very much so"); illogical thinking or loosening of associations; manic syndrome ("reported at times"); hostility and irritability ("reported by mother at times").  R. 302.  Baecher-DiSalvo rated plaintiff's current GAF at 45, and noted that 45 was also his highest GAF during the past year.  Id.[8]  In the space designated "other symptoms and remarks," Baecher-DiSalvo wrote: "grandiose thoughts, expansive mood."  R. 304.  She described the "clinical findings which demonstrate the severity of [plaintiff's] mental impairment and symptoms" as follows: "Dominick is tall, thin nearly 30 yr. who dresses in odd manner [and] often appears somewhat disheveled.  Affect is calm [and] flat as is mood w/ some anxiety evident.  No suicidal/homicidal ideation.  Associations are loose [and] thought/communication often disorganized [and] difficult to follow.  There had been some improvement here w/ medication."  Id.  Baecher-DiSalvo also rated plaintiff's capabilities to perform basic mental activities of work on a regular, continuing basis:

---

[8]  A GAF of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  DSM-IV, at 34.

-13-

<u>No/Mild Loss</u>:
-travel in unfamiliar places
-use public transportation

<u>Moderate Loss</u>:
-remember locations and work-like procedures
-understand and remember very short, simple instructions
-carry out very short, simple instructions
-understand and remember detailed instructions
-carry out detailed instructions
-maintain attention and concentration for extended periods, i.e. 2 hour segments
-maintain regular attendance and be punctual
-sustain an ordinary routine without special supervision
-deal with stress of semi-skilled and skilled work
-work in coordination w/ or proximity to others w/o being unduly distracted
-make simple work-related decisions
-complete a normal workday or workweek w/o interruptions from psychologically-based
      symptoms
-perform at a consistent pace w/o an unreasonable number and length of rest periods
-maintain socially appropriate behavior
-respond appropriately to changes in a routine work setting
-be aware of normal hazards and take appropriate precautions
-ask simple questions or request assistance


<u>Moderate to Marked Loss</u>:
-interact appropriately with the public
-accept instructions and respond appropriately to criticism from supervisors
-get along w/ coworkers and peers w/o unduly distracting them or exhibiting behavioral
      extremes
-adhere to basic standards of neatness and cleanliness

<u>Marked Loss</u>:
-set realistic goals or make plans independently of others

R. 303-05. Finally, Baecher-DiSalvo indicated to what degree the following functional

limitations exist as a result of plaintiff's mental impairment:

    -restriction of activities of daily living: MODERATE
    -difficulties in maintaining social functioning: SLIGHT
    -deficiencies of concentration/persistence/pace (resulting in failure to timely complete
        tasks): OFTEN
    -episodes of deterioration/decompensation in work, work-like settings which cause the
        individual to withdraw from that situation or to experience exacerbation of

signs/symptoms: ONCE OR TWICE

R. 305.

By letter dated October 18, 2011, LCSW Baecher-DiSalvo noted "the fact that [plaintiff] has, for many years, continued to demonstrate the inability to meet and manage the normative age-appropriate tasks and demands of adulthood.  He has been unable to provide adequately for his own sustenance and shelter and shows little ability to do so in the foreseeable future."  R. 358.  Baecher-DiSalvo observed that, although plaintiff often mentioned business opportunities, "there is no evidence that any of these concerns have materialized in any meaningful way, nor is it likely that they will" and questioned their basis in reality.  Id.

On October 25, 2011, Dr. Johnson issued an Interim Supplementary Report (R. 362-63) in which she noted that, since her last report, plaintiff had been undergoing treatment at MHA which included individual psychotherapy and monthly medication management sessions (w/ Dr. Johnson).  R. 362.  Dr. Johnson continued:  "During this period, and despite adequate trials of medication, he continued to demonstrate thought disorder (consistently vague, non-linear, with looseness of association and lack of logic) as well as continuous mood symptoms which ranged from depressive to hypomanic and cycled frequently.  His though content is often mystical and non-specific, he has much difficulty staying on task when asked direct questions.  He is unfocused and disorganized."  Id.  The doctor noted that medication had "yielded some benefit but he remained with residual symptoms and continued low functioning in all domains as well as lethargy as a side effect."  Id.  She also noted plaintiff's poor grooming and that he "often dressed in malodorous, stained and bizarre attire including socks on his hands and arms, and large numbers of safety pins up and down his torn pants."  Id.  According to Dr. Johnson's report, "[t]hough [plaintiff] often has many ideas about employment and seems motivated to

-15-

pursue them, he has poor reality testing and becomes involved in unrealistic pursuits which are dead-ends and have led to no financial gain. He has no insight into his skills or limitations despite much psychoeducation in therapy setting." Id. Dr. Johnson averred that plaintiff's symptoms "are persistent, chronic and episodically worsen (with no sleep for days and corresponding decrease in cognitive function during those times)" and, although they were experimenting with different medications, "it is possible that Mr. Gabrielsen will continue to have significant symptoms for some time." Id. Dr. Johnson concluded: plaintiff's "employability potential is low. He requires ongoing psychiatric management with individual therapy and medications to maintain his current level of function. It is my professional opinion that he is disabled and currently cannot sustain gainful employment as a direct result of his mental illness." Id.

C.    Consultative Examinations

1.    *Alan Dubro, Ph.D.*

On September 29, 2010, psychologist Alan Dubro conducted a consultative examination of plaintiff. R. 268-71. Plaintiff "was cooperative during the exam" and "presented in an appropriate manner." R. 269. He reported intermittent sleep difficulties, longstanding difficulty dealing with stress and intermittent bouts of depression and anxiety. R. 268. Dr. Dubro noted that plaintiff was "adequately groomed" and did not display fidgety or hyperactive behavior during the exam. Id. According to Dr. Dubro, plaintiff's speech was fluent and clear, his thought process was "[c]oherent and goal directed with no evidence of delusions, hallucinations, or thought disorder," his mood was euthymic and his affect appropriate in range. R. 269. Dr. Dubro noted that plaintiff's attention, concentration and memory skills were mildly impaired secondary to nervousness, his insight and judgment were fair and his cognitive functioning was

-16-

above-average.  R. 269-70.  The doctor also noted that plaintiff regularly maintains his hygiene,
prepares meals on a daily basis, does his own laundry and food shopping at least once a week
and does general cleaning in his parents' home several times per week.  R. 270.  Plaintiff
reported that he primarily socializes only with his immediate family.  Id.

Dr. Dubro evaluated plaintiff's functional abilities as follows:  he can "follow,
understand, attend to, and remember directions and instructions;" he performs daily tasks and
complex tasks independently on a regular basis; he is capable of making appropriate decisions;
his attention span, concentration, ability to learn new tasks and to adhere to a routine and
schedule are mildly impaired; he is "displaying moderate difficulties in his ability to interact
with others."  Id.  Dr. Dubro's diagnosis was mood disorder (not otherwise specified) that "does
not significantly interfere with [plaintiff's] ability to function on a daily basis" and he assessed
plaintiff's prognosis as "fair."  R. 271.

    2.    *M. Tatar, Ph.D.*

On October 19, 2010, psychologist M. Tatar prepared a consultative mental residual
functional capacity assessment based upon his review of the record medical evidence.  R. 272-
88.  Dr. Tatar assessed that plaintiff was not significantly limited in his ability to: (1) remember
locations and work-like procedures; (2) understand and remember very short and simple
instructions; (3) understand and remember detailed instructions; (4) carry out very short and
simple instructions; (5) sustain an ordinary routine without special supervision; (6) work in
coordination with or proximity to others without being distracted by them; (7) make simple
work-related decisions; (8) ask simple questions or request assistance; (9) maintain socially
appropriate behavior and adhere to basic standards of neatness and cleanliness; (10) be aware of
normal hazards and take appropriate precautions; (11) travel to unfamiliar places or use public

transportation; and (12) set realistic goals or make plans independently of others.  R. 286-87.

Dr. Tatar assessed that plaintiff was moderately limited in his ability to: (1) carry out detailed

instructions; (2) maintain attention and concentration for extended periods; (3) perform activities

within a scheduled, maintain regular attendance and be punctual within customary tolerances; (4)

complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods; (5) interact appropriately with the general public; (6) accept instructions and respond

appropriately to criticism from supervisors; (7) get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; and (8) respond appropriately to changes in

the work setting.  Id.

     3.    *Fredelyn Engelberg, Ph.D.*

On November 29, 2011, psychologist Fredelyn Engelberg examined plaintiff at the

request of the Westchester County Department of Social Services.  R. 365-70.  At the

examination, plaintiff reported that he experiences "dysphoric moods, feelings of guilt,

hopelessness, loss of usual interests, fatigue, diminished self-esteem, concentration difficulties,

diminished sense of pleasure, and social withdrawal . . . excessive apprehension and worry,

restlessness . . . panic attacks including shortness of breath and the need to get out from where he

is, especially if he is around groups of people. " R. 365.  Plaintiff also stated "that he has racing

thoughts, becomes hyperfocused and then unfocused, cannot sleep for days at a time, and eating

on a fluctuating schedule."  Id.  Plaintiff additionally reported difficulties with organization and

planning.  Id.

     Dr. Engelberg found plaintiff's thought process, orientation, attention and concentration,

recent and remote memory skills and cognitive function to be "normal."  R. 367.  On the other

hand, Dr. Engelberg considered plaintiff's general appearance, speech and language, mood, affect, insight and judgment to be "abnormal." Id. According to Dr. Engelberg, plaintiff was poorly groomed and underweight, he was soft spoken, his mood was dysthymic, his affect was depressed, anxious and helpless and his insight and judgment were both "fair." Id. Dr. Engelberg's diagnostic impressions were bipolar disorder (not otherwise specified), attention deficit hyperactivity disorder (by history) and poly-substance abuse (in sustained full remission). R. 368. The doctor assessed plaintiff's GAF at 41 to 50. Id. Dr. Engelberg assessed plaintiff's functional limitations (in the context of employability) as follows: (1) he was capable of following, understanding and remembering simple instructions and directions, able to use public transportation and was capable of low stress and simple tasks; (2) he was moderately limited in his ability to perform complex tasks independently, maintain attention and concentration for rote tasks, regularly attend to a routine and maintain a schedule and maintain basic standards of hygiene and grooming. R. 368-69. In sum, based upon plaintiff's symptoms of mood disorder (lack of coherent organized thinking, fluctuating mood between depression, anxiety and mania, and his inability to adhere to a regular routine or schedule), Dr. Engelberg concluded that plaintiff "appears to be permanently disabled, [his] condition is not expected to improve, and he is unable to participate in any [work, education and training] activities." R. 369-70. Thus, Dr. Engelberg recommended that the Westchester County Department of Social Services refer plaintiff to the federal SSI program. R. 370.

D.      Hearing Testimony

     1.      *Plaintiff's testimony*

     Plaintiff, who was thirty years old, lived with his mother "most of the time." R. 35-36. He was "working on putting together work but it's not going very well." R. 36. Plaintiff had

been working for over a year to develop some kind of energy business but he earned only $1,000 or $2,000 from one job the company did more than a year earlier.  R. 36-38.  Plaintiff incorporated the business, called AB Energy, LLC but he did not think it was still in existence. R. 37.  He spent nine months (six days a week, many hours each day) "putting together packets, folders, collecting information, reading the state paperwork stuff" but only landed one client.  R. 43-44.  He was a fine arts painter and his cousin had commissioned him to paint.  R. 38. Plaintiff was in the process of setting up an art gallery in New York City with two of his friends. R. 38-39.  He was not sure it would ever open; they were "trying to figure out if it can."  R. 45. He saw a few pieces that might be available and "researched a little bit" but was not presently spending any time on it.  R. 45-46.  His friends did not want him to work there, just to help organize.  R. 60-61.

Plaintiff was two credits shy of a bachelor's degree in fine arts.  R. 42.  He attended college for approximately six years (at Rhode Island School of Design and SUNY Purchase) and was placed on academic probation several times.  R. 44-45.  He worked for a tree service a couple of times (high school into college and then after he came back from California) but he stopped working there because he made too many mistakes.  R. 46.  He had accidentally left the gate ajar on a dump truck and it swung open and hit a mail truck.  Id.  He did not think he could return to that type of work because he was "not in very good shape" and "not very good at consistency, I don't make it in on time."  R. 47.

Plaintiff forgets "everything" such as his keys, wallet, where he is supposed to be and when.  Id.  When he feels manic "it's strange, it's like a heightened state, but it's kind of crippling.  I have a lot of energy, but it's nervous, and I get a lot of anxiety, I start hyperfocusing, but find it very difficult to complete things.  I don't eat.  I stay up for days, you know, those type

of things." R. 48. "Hyperfocusing is getting caught up in a distraction and then kind of going

like – like a mental loop through it again and again." Id. As a result of his hyperfocusing,

plaintiff would "do a bunch of things halfway and realize nothing['s complete." Id. He tried to

earn money to pay off his $400 DWI fine by doing odd jobs (like gardening and painting a sign

for his uncle), but he only earned about half of what he needed so his mother paid the rest of it.

R. 49-50. Plaintiff goes without eating "all the time" because his anxiety causes him to lose his

appetite. R. 50-51. He takes Zyprexa and Geodon, which makes him tired and causes him to

"get this stress ball" in his stomach when he gets anxiety. R. 51. Plaintiff "sometimes" has

problems getting along with other people; when he is hyperfocusing he gets into arguments

about meaningless things and has problems controlling his anger. R. 51-52. He "frequently"

gets into arguments ("probably every day") because his anxiety "creates a fog" in his mind

which causes him to misinterpret a lot of what people say. R. 52. He has problems

concentrating:

> I can't – anything will – a bird lands in a tree outside the window in classroom
> I'm four, five, six, seven, eight, nine, ten. Anything, everything, I'm trying to
> think of another one, well, I mean I get into, for instance, building an architectural
> model back in school and get distracted with the drawings and forget the model,
> start drawings that don't really apply, you know, go off in a tangent, wind up at a
> restaurant.

R. 53. Plaintiff also has problems with his memory:

> It – there's like a – like a part of the brain that remembers things very well that I
> have, it also has to do with the thyroid and I – that works in me, apparently, it's
> amplified by the things that I have chemically, so I can remember extraordinary
> amounts of detail, conversation, I'll remember these, most the things in this room
> come with colors, the buttons on that phone, but it creates a loop cycle in my
> brain where it repeats or it stays there and I can't get right [or] rid of it too. I also
> do forget like – so certain things I can remember but I do forget a lot of things
> also, I forget things I don't remind myself of, and even if I do I forget my
> schedule, meeting times, sometimes actually lately – actually I've been forgetting
> what I was talking about a couple of times – more than a couple of times with my

friends because I got stuck in that loop and –

R. 53-54.  His stress and anxiety were "very acute" prior to therapy; "it's working its way down, but it's still present and lately it's been pretty tough."  R. 55.  His anxiety causes him to feel uncomfortable around people and in public places so he "shut[s] down."  R. 55-56.  He experiences panic attacks "regularly . . . at least every week."  R. 56.

Plaintiff has difficulty with housework, laundry and cleaning because he often gets distracted, but his case manager was helping him to set goals and stay organized.  R. 57-58.  He visits a friend three or four times a week and has a girlfriend whom he sees on the weekends.  R. 58-59.  He and his girlfriend play with their cat, draw, go for walks and read.  R. 59.  Plaintiff has not "finished a book in a very long time" so he mostly reads poetry and the news on his computer.  R. 60.

2.     *Testimony of plaintiff's mother (Barbara Gabrielsen)*

Plaintiff received extra support all through school, from kindergarten on.  R. 65-66. "[H]is attention was scattered" so "he could never pull it all together" to do well in all of his classes, or "just to do evenly in all of them whatever that might have been for him."  R. 66.  He was accepted to college in Rhode Island because of his artwork.  R. 67.  Plaintiff had difficulty preparing a portfolio for college because his assignments were frequently late or missing or he handed in the wrong assignment.  Id.  Up until college, plaintiff always had a part-time job and was financially responsible with whatever money he earned.  Id.

Plaintiff began to have significant academic problems during his second year in college. R. 67-69.  He did not go to classes and, when he did, he would hand in the wrong assignments or no assignment.  R. 68.  He was put on academic probation.  R. 69.  The dean told plaintiff's mother that "it didn't really make sense" because plaintiff did well freshman year.  Id.  He

attended college for about six years but never graduated.  R. 72.  During plaintiff's last year, the

dean told plaintiff's mother he was concerned about plaintiff's mental health and thought

plaintiff may be a pathological liar.  Id.

Plaintiff left college and went to California to stay with a college friend who had started a

business out there.  R. 73.  Plaintiff was in California for about two years and ended up

homeless; he had "unrealistic expectations, he was expecting – he totally misunderstood, he was

expecting his friend to pay his college loans, he just has total misunderstandings of things."  Id.

His parents sent him money so he could come home, and he came back in 2007 or 2008.  R. 73-

74.

His parents told plaintiff he needed to have a job; it took him "months" but plaintiff got a

job "in tree work" (he had done that summers as a kid).  R. 74.  He was fired from that job after a

few months because "he wasn't doing, you know, exactly what he was supposed to do," but the

"last straw" was when "he forgot to latch the back of the dump truck and it flew open on the

highway and hit another car."  R. 74-75.  Instead of finding another job, plaintiff "wanted to just

work on these big plans"– an energy business or huge art studios – huge plans that required

money that plaintiff had no chance of getting.  R. 75.  Plaintiff's energy business was "not real."

R. 72-73.  He printed an entire booklet of information and talked to people nonstop, but never

did a job.  R. 75.  He allegedly had some contact in China that had solar panels but he never

ordered them.  R. 76.  Although plaintiff "believes" that he is involved in opening an art gallery

with his friends, "he's not going to be working there."  R. 76-77.  The girlfriend of plaintiff's

friend, Justin, is renovating some gallery space in New York City, and Justin calls plaintiff's

mother "and says things like, okay, Nick recommended like this person to, you know, refinish

the floors, do you think it's okay that I call them, is this [ ] a real person?"  R. 77.  Plaintiff does

not realize that his friends see the difference in him and suspect something is wrong.  R. 77-78.

Although his old friends still stay in touch with him every couple of months, plaintiff was

"mostly isolated" after he came back from California until about a year before the hearing.  R.

78.  At that point, he started socializing with people who have "special needs."  Id.

Plaintiff is inconsistent with therapy because "he can't pull it together all the time, you

know, there was a – he had to make a phone call to arrange for the transportation, that was

totally overwhelming for him, totally confusing."  R. 79.  Plaintiff "cannot support himself, he

has no roof over his head, he is completely evicted, never paid rent in the place that he thought

he was going to be able to with one of his business plans, he can't hold down a job, his own

uncle won't even take him back just to do tree work because he knows that he can't do it."

### III.  LEGAL STANDARDS

A.    Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the

pleadings and transcript of the record, a judgment affirming, modifying, or reversing the

decision of the Commissioner of Social Security, with or without remanding the cause for a

rehearing."  42 U.S.C. § 405(g).  "It is not the function of a reviewing court to decide *de novo*

whether a claimant was disabled."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).  Rather,

the court's review is limited to "'determin[ing] whether there is substantial evidence supporting

the Commissioner's decision and whether the Commissioner applied the correct legal standard.'"

Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (quoting Machadio v. Apfel, 276 F.3d 103,

108 (2d Cir. 2002)).

The substantial evidence standard is "even more" deferential than the "'clearly

erroneous' standard."  Brault v. Social Sec. Admin, 683 F.3d 443, 448 (2d Cir. 2012).  The

reviewing court must defer to the Commissioner's factual findings and the inferences drawn

from those facts, and the Commissioner's findings of fact are considered conclusive if they are

supported by substantial evidence.  See 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131

(2d Cir. 2000).  Substantial evidence is "'more than a mere scintilla'" and "'means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Lamay v.

Commissioner of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (quoting Richardson v. Perales,

402 U.S. 389, 401 (1971)).  "In determining whether the agency's findings are supported by

substantial evidence, the reviewing court is required to examine the entire record, including

contradictory evidence and evidence from which conflicting inferences can be drawn."  Talavera

v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted).

"When there are gaps in the administrative record or the ALJ has applied an improper legal

standard," remand to the Commissioner "for further development of the evidence" or for an

explanation of the ALJ's reasoning is warranted.  Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

B.      Statutory Disability

        A claimant is disabled under the SSA when he or she lacks the ability "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  In

addition, a person is eligible for disability benefits under the SSA only if

>           his physical or mental impairment or impairments are of such severity that he is
>           not only unable to do his previous work but cannot, considering his age,
>           education, and work experience, engage in any other kind of substantial gainful
>           work which exists in the national economy, regardless of whether such work
>           exists in the immediate area in which he lives, or whether a specific job vacancy
>           exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

Social Security Regulations set forth a five-step sequential analysis for evaluating disability claims under the SSA:

1.    The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.    If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.    If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.    If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.    If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

Rolon v. Commissioner of Soc. Sec., No. 12 Civ. 4808, 2014 WL 241305, at *6 (S.D.N.Y. Jan. 22, 2014); see 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).[9]  The claimant bears the burden of proof as to the first four steps of the process.  See Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003).  If the claimant proves that his impairment prevents him from performing his past work, the burden shifts to the Commissioner at the fifth and final step.  See id.  At the fifth step, the Commissioner must prove that the claimant is capable of obtaining substantial gainful employment in the national economy.  See Butts v. Barnhart, 416 F.3d 101,

_____

[9]  Copies of all unpublished opinions and decisions available only in electronic form cited herein have been mailed to plaintiff.  See Lebron v. Sanders, 557 F.3d 76, 78 (2d Cir. 2009).

103 (2d Cir. 2005).  In making the determination (at step five) of whether there is other work

which the claimant could perform, "the Commissioner must consider four factors: (1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age and work experience."  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir.

1999) (internal quotation marks and citation omitted).

Additionally, where a claimant suffers from an alleged mental impairment, the ALJ is

required to utilize a "special technique" at the second and third steps.  See Kohler v. Astrue, 546

F.3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. §§ 404.1520a, 416.920a.  At step two, in

determining whether the claimant has a "severe impairment," the ALJ must rate the claimant's

degree of functional limitation in four areas: (1) activities of daily living; (2) social functioning;

(3) concentration, persistence, or pace; and (4) episodes of decompensation.  See Kohler, 546

F.3d at 266; 20 C.F.R. §§ 404.1520a(b)-(c), 416.920a(b)-(c).  If the claimant's mental

impairment or combination of impairments is severe, then at step three the ALJ must "compare

the relevant medical findings and the functional limitation ratings to the criteria of listed mental

disorders in order to determine whether the impairment meets or is equivalent in severity to any

listed mental disorder."  Kohler, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(2)).  If the

claimant suffers from a severe impairment which is not listed (or equivalent in severity to a

listed mental disorder), then the ALJ must assess the claimant's residual functional capacity.

See id. (citing § 404.1520a(d)(3)).

C.      Treating Physician Rule

In considering any medical opinions set forth in the administrative record, the ALJ

must give controlling weight to the opinion of a treating physician if it is well-supported by the

-27-

medical record and is not inconsistent with other substantial record evidence.  See Green-

Younger, 335 F.3d at 106; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Pursuant to the

regulations, the ALJ must consider the following factors when assigning weight to the opinion of

a treating source: (1) the length, nature and extent of treatment and the frequency of

examination; (2) the relevant evidence presented by the treating source in support of his opinion;

(3) whether the opinion is consistent with the record as a whole; (4) whether the treating source

is a specialist in the area relating to his opinion; and (5) other factors which tend to support or

contradict the opinion.  See Shaw, 221 F.3d at 134; 20 C.F.R. § 404.1527(d)(2)-(6).  A "treating

source" is a claimant's "own physician, psychologist, or other acceptable medical source who

provides [the claimant], or has provided [the claimant] with medical treatment or evaluation and

who has, or has had, an ongoing treatment relationship with [the claimant]."[10]  20 C.F.R. §§

404.1502, 416.902.

D.     Duty to Develop the Record

        Given the "non-adversarial nature" of the administrative proceedings, the ALJ "has an

obligation to develop the record . . . regardless of whether the claimant is represented by

counsel."  Shaw, 221 F.3d at 131.  Because the "treating physician rule dovetails with the ALJ's

affirmative duty to develop the administrative record," the "duty of the ALJ is particularly

important when it comes to obtaining information from a claimant's treating physician."  Ocasio

v. Colvin, No. 12 Civ. 6002, 2013 WL 1395846, at *9 (E.D.N.Y. Apr. 5, 2013) (internal

--------

        [10] An "ongoing treatment relationship" exists where the claimant "see[s], or ha[s] seen,
the source with a frequency consistent with accepted medical practice for the type of treatment
and/or evaluation required for [the claimant's] medical condition(s)."  20 C.F.R. § 404.1502.
The SSA "may consider an acceptable medical source who has treated or evaluated [the
claimant] only a few times . . . to be [the claimant's] treating source if the nature and frequency
of the treatment or evaluation is typical for [the claimant's] condition(s)."  Id.

quotation marks and citation omitted). Accordingly, the ALJ's obligation to develop the record

"includes obtaining the treating physicians' assessments of the claimant's RFC." Id.

Additionally, Social Security Regulations specify that an ALJ must pay careful attention to

developing the record when a disability claim is based upon a mental disorder:

> Particular problems are often involved in evaluating mental impairments in
> individuals who have long histories of repeated hospitalizations or prolonged
> outpatient care with supportive therapy and medication. For instance, if you have
> chronic organic, psychotic, and affective disorders, you may commonly have your
> life structured in such a way as to minimize your stress and reduce your
> symptoms and signs. In such a case, you may be much more impaired for work
> than your symptoms and signs would indicate. The results of a single examination
> may not adequately describe your sustained ability to function. It is, therefore,
> vital that we review all pertinent information relative to your condition, especially
> at times of increased stress.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E).[11] It is appropriate to "remand[] to the

Commissioner with directions to develop the administrative record further and to reconsider"

where necessary to ensure an accurate assessment of a claimant's entitlement to benefits based

on a fully developed record. Burger v. Astrue, 282 F.App'x 883, 885 (2d Cir. 2008).

## IV.  THE ALJ'S DECISION

To assess plaintiff's disability claim, the ALJ followed the five-step sequential analysis

and applied the "special technique" at steps two and three. See 20 C.F.R. §§

404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v), 404.1520a, 416.920a and discussion, *supra*. At step

---

[11] "Similarly, Social Security Ruling 85–15 directs the Commissioner to consider that
'determining whether these individuals will be able to adapt to the demands or "stress" of the
workplace is often extremely difficult.' The Ruling explains that this difficulty arises because
individuals with mental illnesses 'adopt a highly restricted and/or inflexible lifestyle within
which they appear to function well.' The Rulings point out that, when claimants are in
structured settings, they are able to function adequately 'by lowering psychological pressures, by
medication, and by support from services .'" Lacava v. Astrue, No. 11-CV-7727, 2012 WL
6621731, at *12 (S.D.N.Y. Nov. 27, 2012) (quoting SSA Ruling 85-15).

one, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since the date of his application for disability benefits.  R. 12.  At step two, the ALJ concluded that plaintiff's ADHD and bipolar disorder constituted "severe impairments" within the meaning of the SSA.  Id.

At step three, the ALJ determined that plaintiff's impairments (individually or combined) did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 12.  The ALJ concluded that plaintiff has mild restrictions in activities of daily living and social functioning, and moderate difficulties with concentration, persistence and pace.  R. 12-13.  He noted there was "no evidence to support that the claimant had repeated episodes of decompensation, each of extended duration, meaning three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  R. 13.

At step four, the ALJ concluded that plaintiff can understand, remember and carry out simple unskilled work, and has the residual functional capacity to perform a full range of work at all exertional levels.  R. 13.  In reaching this conclusion, the ALJ considered "objective medical evidence," "other evidence" and "opinion evidence" in accordance with 20 C.F.R. §§ 416.927 and 416.929 and the Social Security Rulings 96-4p, 96-7p, 96-2p, 96-5p, 96-6p and 06-3p.  Id.  Overall, the ALJ determined that, while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the objective medical evidence and in light of the record as a whole.  R. 18.  Finally, at step four, the ALJ determined that plaintiff did not have any past relevant work.  R. 19.

At step five, the ALJ considered plaintiff's residual functional capacity, age, education

-30-

and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404,

Subpart P, Appendix 2. R. 19. He stated that plaintiff's ability to perform work at all exertional

levels was compromised only by nonexertional limitations that had "little or no effect on the

occupational base of unskilled work at all exertional levels." Id. The ALJ concluded that jobs

existed in significant numbers in the national economy that plaintiff can perform and, thus,

found plaintiff "not disabled" as defined in the SSA. Id.

## V. ASSESSING THE ALJ'S FINDINGS

In evaluating plaintiff's residual functional capacity at step four, the ALJ addressed the

medical source statement prepared by plaintiff's "treating psychiatrist" Dr. Rhea Johnson as

follows:

> The psychiatrist notes the claimant has magical thinking to some degree,
> grandiosity, very poor reality testing and that he is easily distracted. The
> psychiatrist goes on to state the claimant is vague and over-generalizes and then is
> circumstantial and tangential in his thoughts. It was also stated the claimant has
> much difficulties staying on tasks and that he has moderate to marked
> occupational limitations, as well as moderate social limitations and episodes of
> decompensation on more than 1 occasion. This assessment cannot be afforded
> great weight, given it is inconsistent by the mental health treating source's own
> treatment notes and is inconsistent with the objective evidence contained in the
> record and the claimant's own statements of record regarding his mental
> functioning. The record shows the claimant has had no documented episodes of
> decompensation since the date his application for benefits was filed. . . . The
> psychiatrist goes on to state the claimant has looseness of association, difficulties
> focusing and being organized, poor grooming and activities of daily living, [sic]
> . . . low employability potential, labile and irritable moods, verbal altercations
> with his family members, anxiety, insomnia, limited self care. Dr. Johnson rated
> the claimant's global assessment of functioning at 40, which is indicative of
> marked mental limitations. Still, Dr. Johnson's own treatment [notes] do not
> document the signs and symptoms she provided in her current narrative reports
> showing the claimant had difficulties with personal care or having vague thought
> processes and other inappropriate behavior. Her reports were also not consistent
> with the examination of Dr. Dubro. Therefore, Dr. Johnson's March and October
> 2011 narrative reports are not afforded great weight.

R. 17.

A.      Failure to Follow the Treating Physician Rule

In the Second Circuit, "to override the opinion of a treating physician . . . the ALJ must

*explicitly* consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the

amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the

remaining medical evidence; and (4) whether the physician is a specialist." Selian v. Astrue, 708

F.3d 409, 418 (2d Cir. 2013) (emphasis added).  See 20 C.F.R. § 404.1527(d)(2)-(6).  "Because

mental disabilities are difficult to diagnose without subjective, in-person examination, the

treating physician rule is particularly important in the context of mental health." Roman v.

Astrue, No. 10-CV-3085, 2012 WL 4566128, at *18 (E.D.N.Y. Sept. 28, 2012) (internal

quotation marks and citation omitted).  Here, the ALJ committed legal error by failing to

explicitly consider several required factors, *to wit*, the frequency, length, nature and extent of

treatment and the amount of medical evidence supporting Dr. Johnson's opinion.  Accordingly, I

conclude and respectfully recommend that this matter be remanded to the Commissioner for

proper application of the treating physician rule to consideration of Dr. Johnson's findings

regarding the nature and severity of plaintiff's impairments.

B.      Failure to Develop the Record

The ALJ's failure to seek any clarification of the perceived gaps and inconsistencies in

Dr. Johnson's findings regarding plaintiff's marked (and other) limitations was also legal error.

Social Security Regulations require an ALJ to "seek additional evidence or clarification from

[the] medical source when [a] report from [the] medical source contains a conflict or ambiguity

that must be resolved" to determine whether the claimant is disabled.  20 C.F.R. §§

404.1512(e)(1), 416.912(e)(1).  "[I]f a physician's report is believed to be insufficiently

explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must

seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." Correale-Englehart v. Astrue, 687 F. Supp.2d 396, 428 (S.D.N.Y. 2010); see also Clark v. Commissioner of Soc. Sec., 143 F,3d 115, 118 (2d Cir. 1998) ("[W]hen an ALJ believes that a treating physician's opinion . . . is internally inconsistent, he may not discredit the opinion on this basis but must affirmatively seek out clarifying information from the doctor."). Here, the ALJ ought to have contacted Dr. Johnson to seek additional information and clarification regarding her assessment of the nature and severity of plaintiff's impairments, before discrediting her March 2011 and October 2011 narrative reports. Accordingly, I conclude and respectfully recommend that the ALJ's failure to do so constitutes an additional basis for remand to the Commissioner.

C.    Failure to Adequately Evaluate Other Source Evidence

The ALJ also failed to properly consider the opinion of LCSW Baecher-DiSalvo. Although Baecher-DiSalvo is not an "acceptable medical source" under SSA regulations, see 20 C.F.R. § 404.1513(a), she is considered an "other source" whose opinion "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." See id. §§ 404.1513(d), 416.913(d); SSR 06-03p, 2006 WL 2329939, at *2 (Soc. Sec. Admin. Aug. 9, 2006). The SSA recognizes the growing importance of non-"acceptable" medical sources:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and *licensed clinical social workers*, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p, 2006 WL 2329939, at *3 (emphasis added). "In fact, an opinion from a 'non-

-33-

medical source' who has seen the claimant in her or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source." Mitchell v. Colvin, No. 09-CV-5429, 2013 WL 5676289, at *8 (E.D.N.Y. Oct. 17, 2013) (internal quotation marks and citation omitted).

At step four, in assessing plaintiff's residual functional capacity, the ALJ noted that plaintiff "was treating at [MHA], covering the period of June 2010 through June 2011." R. 15.[12] However, the ALJ inexplicably ignored plaintiff's course of treatment at MHA from July 2009 through December 2009. R. 15-18. Moreover, the ALJ did not acknowledge any findings in Baecher-DiSalvo's medical source statement, apart from his dismissal of her GAF rating (45) because "many assessments contained in the record show the claimant has moderate mental limitations" and Baecher-DiSalvo's GAF assessment reflecting more serious limitations "was completed specifically for the purposes of claiming disability." R. 18. No other medical source examined or treated plaintiff's mental impairment on a more extensive basis. The record is replete with Progress Notes that document observations made by LCSW Baecher-DiSalvo during treatment sessions and evaluations. Although the ALJ was "not required to accord controlling weight to [Baecher-DiSalvo's] opinion, he is not entitled to disregard [it] altogether." Genovese v. Astrue, No. 11-CV-2054, 2012 WL 4960355, at *15 (E.D.N.Y. Oct. 17, 2012). Accordingly, I conclude and respectfully recommend that this matter be remanded to the Commissioner for proper consideration of LCSW Baecher DiSalvo's findings regarding the nature and severity of plaintiff's impairments.

---

[12] The ALJ mistakenly stated that plaintiff was treated at "Northern Westchester Counseling Center" from June 2010 through June 2011. R. 15. The ALJ's subsequent discussion cited to the Progress Notes from MHA during that period, and there are no treatment records from "Northern Westchester Counseling Center" in the record.

## VI. CONCLUSION

For the reasons set forth above, I respectfully recommend that defendant's motion for judgment on the pleadings be **DENIED** and that the case be **REMANDED** for further administrative proceedings consistent with this Report & Recommendation pursuant to 42 U.S.C. § 405(g), sentence four.[13]

Dated:  May 16, 2014
        White Plains, New York

Respectfully submitted,

Paul E. Davison, U.S.M.J.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days, plus an additional three (3) days, or a total of seventeen (17) days, from service of this Report and Recommendation to serve and file written objections.  See also Fed. R. Civ. P. 6(a), (b), (d).   Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Kenneth M. Karas, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

---

[13]  Moreover, in the interest of providing guidance on remand, I note that the ALJ credited plaintiff's testimony about his business ventures, daily activities and social functioning to his detriment (R. 15, 17), despite record evidence suggesting that plaintiff manifests grandiose thinking and tends to exaggerate his well-being and minimize his failures.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Karas.

A copy of this Report and Recommendation has been mailed to:

Dominik J. Gabrielsen
3 Morris Road
North Salem, NY 10560